IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM J. MURRAY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:03-CV-0888-P |
| TXU CORP., | § | |
| TXU ENERGY COMPANY, L.L.C., | § | |
| TXU PORTFOLIO MANAGEMENT | § | |
| COMPANY, L.P. f/k/a TXU ENERGY | § | |
| TRADING COMPANY, L.P., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendants TXU Corp., et al.'s ("TXU" or "Defendants")

Motion for Partial Summary Judgment ("Defendants' Motion"), filed February 5, 2005.[1]

Plaintiff William J. Murray ("Murray" or "Plaintiff") filed his Response on March 2, 2005, and

Defendants filed their Reply on March 17, 2005.[2]  After considering the parties' arguments and

briefings, and the applicable law, the Court GRANTS Defendants' Motion for Partial Summary

Judgment.

---

[1] "TXU Portfolio Management Company ('TXU PM') is a subsidiary of TXU Energy, which is a subsidiary of TXU Corp., a publicly traded energy company in Dallas, Texas." Horgan Aff. ¶ 5.

[2] Additionally, Plaintiff filed his Expedited Motion to Strike (or Refuse to Consider) Defendants' Reply Brief (and Supplemental Appendix) or in the Alternative for Leave to File Surreply and Brief in Support on March 28, 2005. *Infra* Part I.a. Also, pursuant to this Court's May 13, 2005, oral request, Plaintiff and Defendants submitted additional briefing on May 20, 2005, ("Pl.'s May 20 Br." and "Defs.' May 20 Br." respectively) regarding the issue of whether state law barred Plaintiff from bringing his fraud claim. *Infra* Part IV.

I.      **Background and Procedural History**

In December 2000, VJ Horgan ("Horgan"), then President of TXU Optimization Company LLC, hired Plaintiff as Senior Vice President-Capital Management of TXU PM.[3] Horgan Aff. ¶ 6 (Defs.' App. at 1). "Prior to starting work, [Plaintiff] negotiated the terms of his employment with Horgan and [TXU's] counsel." Defs.' Mot. at 2-3 (citing Murray dep. at p. 389, ll. 12-18 (Defs.' App. at 147)); *see also* Murray Aff. ¶¶ 2-4 (Pl.'s App. at 196-97). Thereafter, "Murray signed an Employment Agreement [(the "Employment Agreement")] with a stated effective date of December 1, 2000." Defs.' Mot. at 3 (citing Employment Agreement at 1-8 (Defs.' App. at 5-12)). Therein, "[t]he Employment Agreement described Plaintiff's duties as including 'responsibility for defining, implementing and overseeing Employer's Capital management function . . . [and] such duties and tasks as he may be called upon by Employer to perform from time to time." Defs.' Mot. at 3 (citing Defs.' App. at 5) (alterations in original). Approximately twenty months later, on August 1, 2002, Defendants terminated Plaintiff and paid him severance of $386,250. *See* Horgan Aff. ¶ 17 (Defs.' App. at 3) *and* Graves Aff. ¶ 10 (Defs.' App. at 27).

Defendants hired Plaintiff when TXU "was in the process of significantly ramping up its business and expanding its operations outside of Texas." Horgan Aff. ¶ 9 (Defs.' App. at 2). To wit, "[TXU's] Capital Management group was a new group that did not exist prior to Murray's hiring. Murray hired four full-time and one part-time employee into the Capital Management group to report directly to him." *Id.* The full-time employees included Dan Lorden, Mike

---

[3] Although this Memorandum Opinion and Order involves several separate entities, such as TXU Optimization Company LLC and TXU PM, the Court will refer to all such organizations as "TXU."

**3:03-CV-0888-P**
**Order GRANTING Defendants' Motion for Partial Summary Judgment**
**Page 2**

Garberding, Brian Kerrigan ("Kerrigan") and Charles Jennings ("Jennings").  John Hunt filled

the position of part-time employee.  Horgan dep. at p. 178, ll. 18-24 (Defs.' App. at 106).  The

Capital Management group's responsibilities included "identifying and bringing in deals that

would add significant value to [TXU] both inside and outside of Texas."  Horgan Aff. ¶ 9 (Defs.'

App. at 2).

"Incentive compensation was the subject of considerable discussions between Horgan

and [Plaintiff] during contract negotiations."  Defs.' Mot. at 3; *see also* Murray Aff. ¶¶ 2-4 (Pl.'s

App. At 196-97).  During these negotiations, no annual incentive plan ("AIP") with an AIP

bonus existed at TXU, *see* Murray dep. at p. 386, l. 18 to p. 389, l. 11 (Defs.' App. at 146-47),

"and Horgan did not make any commitment on behalf of [TXU] or otherwise regarding the terms

of an incentive plan," Defs.' Mot. at 3 (citing Murray at dep. p. 390, l. 14 to p. 391, l. 14 (Defs.'

App. at 147)); *see also* Murray Aff. ¶ 4 (Pl.'s App. At 197).  However, Horgan did affirm to

Plaintiff that TXU was "in the process of creating an incentive plan that would reward

employees for creating value for TXU."  Murray Aff. ¶ 4 (Pl.'s App. at 197); *see also* Horgan

Aff. ¶ 8 (Defs.' App. at 2).  Indeed, Plaintiff's Employment Agreement contained provisions

stating Plaintiff would be eligible to participate in both short-term and long-term compensation

plans "as [TXU] may designate from time to time . . . ."  Employment Agreement ¶ 4(c)-(d)

(Defs.' App. at 5-6).

Additionally, "[p]aragraph Five of the Employment Agreement contains severance terms

setting forth a calculation for determining [Plaintiff's] severance in the event of termination

without cause."  Defs.' Mot. at 4 (citing Employment Agreement ¶ 5 (Defs.' App. at 7)).  In

pertinent part, the severance provision states that:

> Employee shall, in lieu of any other severance benefits which might otherwise be available to Employee, or other payments which would have otherwise been made hereunder, be entitled to receive a one-time cash payment equal to the sum of: (1) one (1) year's base salary at the highest rate in effect during Employee's employment with Employer; and (2) Employee's target annual bonus award for the year of the termination.[4]

"During Murray's employment, TXU PM incentive compensation plans were in place for calendar years 2001 and 2002." Defs.' Mot. at 4; *see also* Graves Aff. ¶4. These plans "governed the payment of incentive compensation," and included "the 2001 TXU Energy Trading Company Annual Performance Incentive Plan ('2001 AIP Plan') and 2002 TXU Energy Annual Performance Incentive Plan' [sic] ('2002 AIP Plan') . . . (collectively the 'AIP Plans' or the "Plan')." Defs.' Mot. at 4 (citing 2001 [TXU] Annual Performance Incentive Plan; 2002 [TXU] Annual Performance Incentive Plan (Defs.' App. at 29-37; 38-47)). Each plan "included a supplemental and discretionary Net Present Value [("NPV")] bonus provision. Murray participated in these plans during his employment. *See* Graves Aff. ¶¶ 7-9 (Defs.' App. at 27).

"The AIP Plans set up a bonus compensation pool for 2001 and 2002 based on TXU Energy's earnings before interest and taxes ('EBIT')." Defs.' Mot. at 5 (citing 2001 AIP Handout (Defs.' App. at 67)). TXU based its pool upon: "(1) [an employee's] target incentive level (a percentage of base salary); and (2) a performance based multiplier." Defs.' Mot. at 5 (citing 2001 AIP Handout (Defs.' App. at 67)); *cf.* Graves Aff. ¶ 6 (Defs.' App. at 267-27). "In [Plaintiff's] case, his 2001 target annual incentive level was . . . 75% of his 2002 base salary of $257,500 (.75 x $257,500 = $193,125)," and his "performance-based multiplier was set at 1.5

---

[4] Accordingly, Plaintiff's severance of $386, 250 consisted of: "(1) [Plaintiff's] 2002 base salary of $257,500 (his highest annual base with [TXU]); and (2) his $128,750 target annual bonus for 2002 ($275,500 base salary x 50% target)." Defs.' Mot. at 20 (citing Graves Aff. ¶ 7 (Defs.' App. at 27)).

3:03-CV-0888-P
Order GRANTING Defendants' Motion for Partial Summary Judgment
Page 4

(1.5 x $193,125 = $289,687.50) . . . ."  Defs.' Mot. at 5 (citing Graves Aff. ¶ 6 (Defs.' App. at

26-27)).  Accordingly, on March 15, 2002, Murray received a 2001 AIP Award of $289,688.

Graves Aff. ¶ 8 (Defs.' App. at 27).

        Plaintiff asserts, and Defendants concede, that the only physical information Plaintiff

received regarding the NPV Bonus Plan was a PowerPoint handout (the "2001 AIP Handout")

given to Plaintiff by Horgan.  *See* Murray Aff. ¶ 5 (Pl.'s App. at 197-98); Murray dep. at p. 394,

ll. 8-22 (Defs.' App. at 148).  The 2001 AIP Handout states that "[t]he Supplemental NPV

Incentive Awards Pool is designed to be a discretionary incentive to recognize those who create

deals that add long-term value to [TXU]," and that "[u]p to 5% of the project NPV is available

for awards, 2.5% at close and 2.5% at one year look back."[5]  2001 AIP Handout at 3 (Defs.'

App. at 69).  It states further that "[a]ward payments are fully discretionary based upon each

participant's contribution to the project" and that "[p]ayouts require the Awards Committee and

CEO approval."  *Id.*

        In the Spring of 2002, Plaintiff served on a committee "that attempted to 'try to get better

specificity on how NPV Bonuses would be calculated.'"  Defs.' Mot. at 7 (citing Murray dep. at

p. 415, l. 17 to p. 416, l. 10 (Defs.' App. at 153-54)).  Plaintiff testified that "basically what we

used the committee for was to try to better tie down exactly how the plan worked and make sure

there was no misunderstandings about how the plan worked."  Murray dep. at p. 416, ll. 6-19

(Defs.' App. at 154).

---

[5] The timing of the NPV Bonus Plan establishes that Defendants terminated Plaintiff before the payout was to be made.  *Compare* Murray Aff. Ex. B, Employment Agreement (Pl.'s App. at 217) ("Up to 5% of the project NPV is available for awards (2.5% at close and 2.5% at one year look back") *with* Murray Aff. ¶ 10 (Pl.'s App. at 201) ("[Plaintiff] asked Horgan if the reason [he] did not receive a Fulcrum NPV bonus in the Spring of 2002 was that the project closed after January 1, 2002. She replied, "yes.") *and* Horgan Aff. ¶ 17 (Defs.' App. at 3) (stating Horgan terminated Plaintiff on August 1, 2002).

Additionally, in March and May of 2002, Plaintiff sent and received communications regarding the AIP Plan and NPV Bonus provisions to both Horgan, and Mary Kenner ("Kenner)–a fellow committee member. In particular, in an e-mail dated March 21, 2002, and sent by Kenner to Plaintiff and others, Kenner discusses a draft of the NPV Bonus Plan, which states that "[a]ward payments are fully discretionary," but questions whether payouts require the approval of the Awards Committee and the CEO or merely approval by Horgan. March 21, 2002, e-mail from Kenner (Defs.' App. at 73); *cf.* Murray dep. at p. 421, l. 4 to p. 422, l. 6 (Defs.' App. at 155). In a similar e-mail, dated March 22, 2002, sent by Kenner to Plaintiff and others, a subsequent draft of the NPV Bonus Plan states that the NPV Bonus Plan "is designed to be a discretionary incentive," but mandates that "[p]ayouts require the Awards Committee and CEO approval." March 22, 2002, e-mail from Kenner (Defs.' App. At 78-79).

Subsequently, in an e-mail dated May 8, 2002, from Plaintiff to Horgan, Plaintiff questioned whether current severance agreements could be modified. Specifically, Plaintiff inquired about the possibility of having severance agreements that allowed "for payment of deferred bonuses upon termination other than for cause or upon a change in control." May 8, 2002, email from Plaintiff (Defs.' App. at 23). Finally, in an e-mail dated May 22, 2002, again from Plaintiff to Horgan, Plaintiff asks for clarification "on the methodology used in calculation of [the NPV Bonus Plan] by obtaining agreement on the examples that were previously forwarded to Brian Dickie [("Dickie")] . . . ."[6] May 22, 2002 e-mail from Plaintiff (Defs.' App. at 25).

---

[6] TXU employed Dickie "from April 1999 until the end of August 2003." Dickie dep. at p. 12, ll. 1-2 (Pl.'s App. at 294). During his tenure, he reported to Erle Nye, the Chairman and Chief Executive Officer. *Id.* at p. 11, ll. 20-24 (Pl.'s App. at 294). Also during this time, Horgan reported to Dickie. *Cf. id.* at p. 200, ll. 7-23 (Pl.'s App. at 298).

**3:03-CV-0888-P**
**Order GRANTING Defendants' Motion for Partial Summary Judgment**
**Page 6**

Plaintiff worked on "two transactions during [his] employment with TXU that qualified for [the NPV Bonus Plan]." Murray Aff. ¶ 10 (Pl.'s App. at 201); *see also* Murray dep. at p. 225, l. 20 to p. 228, l. 9 (Defs.' App. at 138-39). Fulcrum, the first transaction, was based on an approximate value of $50 million. Neptune, the second transaction, apparently "executed its development loan agreement the day before [Plaintiff] was fired . . . ." Murray dep. at p. 228, ll. 3-4; p. 429, ll. 18-25 (Defs.' App. at 139; 157).

On April 28, 2003, Plaintiff filed his Original Complaint and asserted two claims against Defendants: (1) retaliatory termination in violation of § 806 of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 802, *codified at* 18 U.S.C. § 1514A; and (2) breach of contract for failure to pay salary incentive compensation under the terms of his Employment Agreement with TXU. Additionally, on August 24, 2004, this Court Granted Plaintiff's Expedited Motion for Leave to Amend and File First Amended Complaint and Jury Demand. Accordingly, on August 24, 2004, Plaintiff filed his First Amended Complaint and Jury Demand, and added a (3) claim of fraud for misrepresentation of the NPV Bonus Plan.

### a.    Motion to Strike

This Court dispenses quickly with Plaintiff's Expedited Motion to Strike (or Refuse to Consider) Defendants' Reply Brief (and Supplemental Appendix) or in the Alternative for Leave to File Surreply and Brief in Support ("Motion to Strike"), filed March 28, 2005. Defendants filed their Response ("Response to Motion to Strike") on April 1, 2005, and Plaintiff filed his

Reply ("Reply to Motion to Strike") on April 18, 2005.  After considering the parties' arguments

and briefings, and the applicable law, the Court DENIES Plaintiff's Motion to Strike.[7]

The purpose for having a motion, response, and reply is to give the movant the final

opportunity to be heard, and "to *rebut* the nonmovants' response, thereby persuading the court

that the movant is entitled to the relief requested by the motion."  *Pennsylvania Gen. Ins. Co. v.*

*Story*, No. Civ. A. 3:03CV0330-G, 2003 WL 21435511, at *1 (N.D. Tex. June 10, 2003)

(emphasis added).  A sur-reply is appropriate by the non-movant only when the movant raises

new legal theories or attempts to present new evidence at the reply stage.  In this case, Plaintiff is

not challenging any newly-presented legal theories raised by Defendants in their Reply.  Plaintiff

simply wants an opportunity to continue the argument.  Nevertheless, the Court addresses each

of Plaintiff's concerns.

Plaintiff's first two concerns deal with purported new arguments raised by Defendants.[8]

These contentions lacks merit.  All of Defendants' arguments either rebut Plaintiff's Response,

or bolster the arguments made in Defendants' initial Motion.  Yet, Plaintiff contends that

"Defendants have misstated many of Plaintiff's arguments," and that this tactic could "trick" and

"distract" the court.  Mot. to Strike at 9, 10.  Again, such contentions lack substance.  The Court

---

[7] In its Motion to Strike, Plaintiff states: "If the Court declines to strike Defendants' Reply . . ., [Plaintiff's counsel
believes] it is essential . . . to write and submit a sur-reply brief to deal with Defendants' new arguments and new
evidence."  Gillespie Aff. ¶ 4 (Mot. to Strike App. at 2).  However, a party must seek leave from the Court *before*
filing a sur-reply.  Plaintiff's Motion to Strike asks for such leave.  Nevertheless, as the Court finds Defendants
raised no *new* arguments in their Reply, Plaintiff's Motion to Strike, as well as its ability to file a sur-reply is
DENIED.

[8] Plaintiff distinguishes "regular" new arguments, those Defendants "did not [allegedly] put in their February 2, 2005
brief from the 'special' new arguments, where Defendants' [alleged] new argument uses the stawman [sic]
technique, where Defendants misstate Plaintiff's argument and craft a new argument to address the illusory
position."  Mot. to Strike at 7 n.6.

**3:03-CV-0888-P**
**Order GRANTING Defendants' Motion for Partial Summary Judgment**
**Page 8**

is well aware that a party will buttress its own arguments while trying to undermine those from opposing parties. Such tactics are neither novel, nor surprising. Indeed, they are expected to a certain extent. In short, the Court need not be coddled in its reading of motions and briefs.

Plaintiff's third concern is Defendants citation to caselaw not previously cited by either party. Plaintiff offers *no support* for its contention, and at the same time contends the burden of validity remains with Defendants.[9] Assuming no new arguments are raised, the Court finds it nonsensical to believe a party must limit its research to previous briefings. Moreover, Defendants present persuasive authority such "tactics" are valid. *See* Resp. to Mot. to Strike at 4 ("Federal courts do not reject reply briefs' citations to additional authority in support or rebuttal of existing arguments.") (citing *Jackson v. Worldwide Flight Services, Inc.*, No. 03 C 1940, 2004 WL 2203430, at *1 n.2 (N.D. Ill. Sept. 29, 2004); *Siegemund v. Shapland*, No. 01-277-P-H, 2002 WL 31123861, at *6 (D. Me. Sept. 26, 2002) *overruled on other grounds*, 247 F.Supp.2d 1 (D. Me. 2003)).[10]

Plaintiff's final concern is that Defendants surreptitiously excluded portions of Plaintiff's deposition in their Reply. Again, such arguments fail. Parties routinely include *portions* of depositions in their appendices. This is not a novel technique, nor one the Court finds surprising. In fact, the practice is commonplace.[11] Of course, Plaintiff's concern of context loses all validity

---

[9] To the extent Plaintiff objects to the use of new caselaw because it raises new arguments, such worry is moot. The Court previously found that Defendants raised no new arguments in their Reply.

[10] Despite Defendants citation of *some* authority, Plaintiff retorts that "both decisions from outside the Northern District of Texas, [do] not remotely approve the massive use of new case authority . . . in their purported reply brief." Resp. to Mot. to Strike at 3. However, Plaintiff cites no authority stating, *or even implying*, that where no new arguments are raised, a party is prohibited from citing "new" caselaw.

[11] Indeed, Plaintiff itself uses *portions* of depositions. *See, e.g.*, Pl.'s App. at 159-60 (jumping from page 25 to page 42 of Jennings' deposition); Pl.'s App. at 299 (ending Dickie's deposition in mid-stream).

3:03-CV-0888-P
Order GRANTING Defendants' Motion for Partial Summary Judgment
Page 9

when Defendants note that "the questions and answers immediately preceding [the disputed portion] were included in Defendants' original appendix." Resp. to Mot. to Strike at 5 (citing Murray dep. at p. 449, l. 16 to p. 450, l. 13 (Defs.' App. at 160)).

In sum, the Court finds Defendants raised no new arguments in their Reply. For the foregoing reasons, Plaintiff's Motion to Strike is hereby DENIED.

## II.   Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323.

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a material fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless she provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248-50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trail, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

Finally, the Court has not duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.*

## III.    Breach of Contract

To prove breach of contract under Texas law, a party must show:  (1) the existence of a valid contract; (2) performance of the contractual obligations; (3) breach of the contract; and (4) injury resulting from the breach. *Hussong v. Schwan's Sales Enterprises, Inc.*, 896 S.W.2d 320, 326 (Tex.App.Houston [1st Dist.] 1995, no writ). While the necessary elements of oral and written contracts do not differ, *see Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555 (Tex.App.–Houston [14th Dist.] 2002, no writ), "the *terms* of an oral contract must be clear, certain and definite." *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.–Houston [1st Dist.] 1992, writ denied) (emphasis added). To wit, "[i]f an alleged agreement is so indefinite that it is

impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute

an enforceable contract." *Id.*

### a.    Severance Provision

Regardless of oral contracts and promises made, the Employment Agreement precludes

their enforcement.  Thereunder, it states if:

> Employee is terminated by Employer . . . without Cause . . . Employee shall, *in
> lieu of* any other severance benefits which might otherwise be available to
> Employee, or *other payments* which would have otherwise been made hereunder,
> be entitled to receive a one-time cash payment equal to the sum of:  (1) one (1)
> year's base salary at the highest rate in effect during Employee's employment
> with Employer; and (2) Employee's target annual bonus award for the year of the
> termination.

Employment Agreement ¶ 5(a) ("Severance Provision") (Defs.' App. at 208) (emphasis added).

All parties agree that "[TXU] paid [Plaintiff] gross severance of $386,250."  Defs.' Mot.

at 20 (citing Graves Aff. ¶ 7 (Defs.' App. at 27)).  This amount consisted of: "(1) [Plaintiff's]

2002 base salary of $257,500 (his highest annual base with [TXU]); and (2) his $128,750 target

annual bonus for 2002 ($275,500 2002 base salary x 50% target)."[12]  *Id.*  "These undisputed facts

render moot the academic discussion about whether Plaintiff had earned a bonus, what triggered

the bonus entitlement, and the amount of any such bonus."[13]  Defs.' Reply at 3.

---

[12] Plaintiff argues that Defendants reduced his 2002 target bonus from 75% to 50% (of his annualized base salary) in
violation of his Employment Agreement. *See* Pl.'s Resp. at 22 (citing Employee Agreement ¶ 4(c)).  This argument
patently fails.  Although the Employment Agreement states that "[f]or calendar year 2001, [Plaintiff was] eligible for
an annual incentive award with a target payment equal to 75% of [his] current annualized base salary," Employment
Agreement ¶ 4(c) (Defs.' App. at 206), *no mention* was made for calendar year 2002.  Moreover, Plaintiff "provides
no evidence that he was ever promised a 2002 target bonus in the first place."  Defs.' Reply at 10.

[13] Moreover, Plaintiff fails in his attempt to reclassify the Severance Provision argument as either an "accord and
satisfaction," or "payment" defense.  The defense of accord and satisfaction rests upon a new contract, express or
implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment
tendered and accepted. *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969).  There is no new contract

Notwithstanding the Severance Provision, Plaintiff "implies indirectly that the provision in the Employment Agreement granting him severance in lieu of other payment otherwise due under the contract is invalid under Texas law." Defs.' Reply at 6 (citing Pl.'s Resp. at 28-29); *see also* Pl.'s Resp. note 137 and accompanying text. However, provided the contractual language addresses the situation specifically, the employer may control the terms of discharge. *Cf. Coleman v. Graybar Electric Co., Inc.*, 195 F.2d 374 (5th Cir. 1952) ("[A] construction of the language which would permit the employer to terminate the continuity of service without any cause . . ., or because of a desire to evade the payment of additional compensation would be entirely inconsistent . . . *in the absence of clear and compelling language* . . . ."). The Severance Provision states unequivocally what will happen upon termination without cause. Plaintiff received full compensation according to its terms; contractual arguments to the contrary lack merit.[14]

As such, Defendants' Motion for Partial Summary Judgment is GRANTED with respect to Plaintiff's claim for breach of contract.

## IV.   Fraud

To prove fraud under Texas law, a party must show that: (1) a material misrepresentation was made; (2) the representation was false; (3) the speaker made the representation knowing it was false or made it recklessly without any knowledge of its truth; (4)

---

in this case; Defendants rely on the Employment Agreement that they paid the *full amount* of their obligation. *See* Defs.' Am. Answer at 2.

[14] Additionally, the Employment Agreement contains a merger clause which dictates that any modifications to the Employment Agreement "will be effective only if [they are] in writing signed by both of the parties hereto." Employment Agreement ¶ 11 (Defs.' App. at 212).

the speaker made the representation with the intention that it should be relied upon by the party; (5) the party acted in reliance upon the misrepresentation; and (6) the party thereby suffered injury. *Norman v. Apache Corp.*, 19 F.3d 1017, 1022 (5th Cir. 1994).

Failure to disclose a material fact may also constitute fraud if the offending party had a duty to disclose the fact. *Union Pac. Res. Group, Inc. v. Rhone-Poulene, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001). A party incurs a duty to disclose a material fact when: (1) there is a fiduciary or confidential relationship between the parties; or (2) a party later discovers its earlier affirmation to be false or misleading; or (3) a party knows of another party's reliance on a concealed fact, provided that the former party knows of the relying party's ignorance of the concealment and that the relying party is without matched opportunity to discover the truth; or (4) a party makes partial disclosure, the actions of which convey a false impression. *Id.* at 586 (citing *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.–Fort Worth 1998, pet. Denied)).

"In order to prove reliance, the party claiming fraud must show actual and justifiable reliance on the defendant's representations." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002) (citing *Haralson v. E.F. Hutton Group, Inc*, 919 F.2d 1014, 1025 (5th Cir. 1990)). Moreover, "[t]o determine justifiability, courts inquire whether -- given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud -- it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson*, 919 F.2d at 1026. Finally, "[i]t is not necessary that the representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel*, 284 F.3d at 636 (citing *First State Bank v. Olde Colony House*, 414 S.W.2d 221, 223-24 (Tex.App. 1995)).

### a.    Contort Liability

"It has long been the rule in Texas that 'mere nonfeasance under a contract' only creates

liability for breach of contract." *Great Am. Life Ins. Co. v. Martin*, No. 05-00-01333-CV, 2002

WL 1792458, at *1 (Tex.App. – Dallas Aug. 6, 2002) [hereinafter *Martin*] (citing *Crawford v.

Ace Sign, Inc.*, 917 S.W.2d. 12, 13 (Tex. 1996)). "Tort obligations are in general obligations that

are imposed by law -- apart from and independent of promises made and therefore apart from the

manifested intention of the parties -- to avoid injury to others." *Southwestern Bell Tel. Co. v.

DeLanney*, 809 S.W.2d 494, 494 (Tex. 1991). "In determining the type of action brought,

[Texas courts] look to the *substance* of the cause of action rather than the manner in which the

party pleaded the action." *Martin*, 2002 WL 1792458, at *1 (emphasis added) (citing *Jim Walter

Homes, Inc. v. Reed*, 711 S.W.2d 617-18 (Tex. 1986)).

Moreover, Texas courts consider both "the source of the defendant's duty to act . . . and

the nature of the remedy sought by the plaintiff" when determining whether fraud constitutes a

separate cause of action. *Crawford*, 917 S.W.2d at 13. First, "[i]f the defendant's conduct . . .

would give rise to liability independent of the fact that a contract exists between the parties, the

plaintiff's claim may also sound in tort." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d

493, 494 (1991). Second, "[w]hen the only loss or damage is to the subject matter of the

contract, the plaintiff's action is ordinarily on the contract." *Id.*

Additionally, notwithstanding the general rule, "tort damages are recoverable for a

*fraudulent inducement* claim irrespective of whether the fraudulent representations are later

subsumed in a contract or whether the plaintiff only suffers an economic loss related to the

subject matter of the contract."[15] *Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (emphasis added). Although Defendants argue that "Plaintiff has not plead nor does he allege a claim for fraudulent inducement into contract," Defs.' May 20 Br. at 7 (citing Pl.'s Am. Compl. ¶¶ 156, 160, 164), that argument is simply incorrect. *See, e.g.*, Pl.'s Am. Compl. ¶ 163 ("Horgan intended to induce [Plaintiff] to remain with TXU"); Murray Aff. ¶ 11 (Pl.'s App. at 202) ("[Plaintiff] relied on Horgan's explanation of the NPV Bonus Plan . . . in not pursuing potential opportunities to move to other jobs outside of TXU . . . ."). Instead, "Plaintiff alleges he was promised certain NPV bonuses *to induce him to continue working* for TXU and to recruit his team and for them to acquire valuable deals for TXU." Pl.'s May 20 Br. at 6 (emphasis added); *see also* Murray Aff. ¶ 11 (Pl.'s App. at 202).

At this point, the Court finds it unnecessary to decide: (1) whether such an argument is viable under the fraudulent inducement exception; (2) whether there is sufficient evidence of inducement; and (3) whether there is sufficient evidence of reliance. As with the breach of contract analysis, the Employment Agreement precludes Plaintiff's claims of fraud and fraudulent inducement. Plaintiff seeks compensation under the NPV Bonus Plan as his remedy for Defendants' alleged fraud. The Severance Provision states unequivocally what will happen upon termination without cause. Even if Plaintiff's understanding of the NPV Bonus Plan as modified by Horgan's statements is accepted, Plaintiff would not have received his first bonus payment until 2003. The Employment Agreement bars payment of any deferred bonus

---

[15] The elements of fraudulent inducement mirror those of fraud. *See Formosa*, 960 S.W.2d at 47-48.

payments.[16]  Plaintiff received full compensation according to the Severance Provision; fraudulent NPV arguments to the contrary lack merit.

As such, Defendants' Motion for Partial Summary Judgment is GRANTED with respect to Plaintiff's claims for fraud and fraudulent inducement.

## V.    Sarbanes-Oxley

Finally, Defendants maintain they are entitled to summary judgment on Plaintiff's claim that his bonus was reduced in violation of Section 806 of the Sarbanes-Oxley Act.  Defendants assert such an action must fail as "it arose before the Act's date of July 30, 2002, and the Act does not retroactively apply to adverse employment actions."  Defs.' Mot. at 36 (citing 29 C.F.R. § 1980 (2003)).  Plaintiff responds that such argument is unnecessary.  Specifically, the alleged 2001 bonus reduction "is relevant to proof on Murray's Sarbanes-Oxley termination claim that Defendants reacted negatively to [Plaintiff's] protected activity.  It is not before the Court as a claim to be reimbursed the amount of any 2001 bonus that was cut by Defendants prior to the passage of Sarbanes-Oxley."  Pl.'s Resp. at 50.  Therefore, the Court finds it unnecessary to determine whether Plaintiff's bonus was reduced in violation of the Act; such an issue is part of a larger question not addressed by Defendants' Motion.  In short, Plaintiff's claim for retaliatory termination in violation of Sarbanes-Oxley remains.

---

[16] It appears that Plaintiff understood this as his emails of March 24, 2002, May 8, 2002, and May 22, 2002, show Plaintiff was attempting to change the Severance Provision payments. *See* Horgan Aff. Exhibits C, D, E (Defs.' App. at 21, 22-23, 24-25).

## VI.    Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motion for Partial Summary

Judgment.


**It is so ordered.**


Signed this 27th day of May 2005.




*Jorge A. Solis*
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE